# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JEFFREY ALLEN RIBOLLA,            :

                             :

        Plaintiff,             :

                             :

        v.                  :        Civ. No. 15-191-LPS

                             :

NANCY A. BERRYHILL[1]        :

Acting Commissioner of Social Security,   :

                             :

        Defendant.          :

Angela Pinto Ross, DOROSHOW, PASQUALE, KRAWITZ & BHAYA, Wilmington, DE.

        Attorney for Plaintiff.

David C. Weiss, Acting United States Attorney, and Patricia A. Stewart, Special Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Wilmington, DE.

Of Counsel: Nora Koch, Acting Regional Chief Counsel, Region III and Rafael Melendez, Assistant Regional Counsel, of the Social Security Administration, Philadelphia, PA.

        Attorneys for Defendant.

## MEMORANDUM OPINION

March 31, 2017
Wilmington, Delaware

---

[1]Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for former Commissioner Carolyn W. Colvin as defendant in this suit.

STARK, U.S. District Judge:

# I.     INTRODUCTION

Plaintiff Jeffrey Allen Ribolla ("Ribolla" or "Plaintiff") appeals the decision of Defendant Nancy A. Berryhill, the Acting Commissioner of Social Security ("the Commissioner" or "Defendant"), denying his claim for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-403, 1383(c)(3).  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Before the Court are the parties' cross-motions for summary judgment.  (D.I. 12, 16) Plaintiff Ribolla seeks remand to the Commissioner for proper consideration of the record and consideration of new evidence.  (D.I. 13 at 35)  The Commissioner requests that the Court affirm the decision denying Ribolla's claim for SSI.  (D.I. 17 at 2, 6-10)

For the reasons stated below, the Court will deny Plaintiff's motion for summary judgment and grant Defendant's motion.

# II.    BACKGROUND

### A.    Procedural History

On January 11, 2011, Ribolla filed a Title XVI application for SSI, alleging disability beginning January 15, 2006.  (D.I. 8 ("Transcript" and hereinafter "Tr.") at 22)  Ribolla's claim was denied initially on April 7, 2011, and again upon reconsideration on August 16, 2011.  (Tr. at 22)  Dissatisfied with this determination, Ribolla requested a hearing before the Administrative Law Judge ("ALJ"), pursuant to 20 C.F.R. § 416.1429.  (Tr. at 22)  The hearing took place on April 24, 2013, at which both Ribolla and an impartial vocational expert ("VE") testified, followed by a supplemental hearing on August 6, 2013, at which a second impartial VE testified.

1

(Tr. at 22) After the hearings, on August 8, 2013, the ALJ issued a decision finding that Ribolla had several severe impairments – including right hip fracture, left shoulder arthroscopy, lumbar degenerative disc disease, obesity, and depression – but was not disabled within the meaning of the Social Security Act and could perform jobs existing in significant numbers in the national economy. (Tr. at 24, 35) Ribolla requested review of this decision on August 19, 2013, which was denied on December 30, 2014, making the ALJ's decision the final decision of the Commissioner. (Tr. at 1, 17)

On February 27, 2015, Ribolla filed suit in the District of Delaware seeking judicial review of the Commissioner's denial of benefits. (D.I. 1) The parties completed briefing on their cross-motions for summary judgment on November 25, 2015. (D.I. 13, 17, 18)

**B.     Factual History**

At the time he applied for SSI, Ribolla was 40 years old and defined as a younger individual under 20 C.F.R. § 416.963. (Tr. at 23, 34) He has a high school education and past work experience as a kitchen helper/dishwasher, forklift operator, retail stock clerk, and truck driver/plow operator. (Tr. at 23) In seeking SSI, Ribolla asserts that he is unable to work because of neck, back, and hip pain, mental health problems, and kidney problems. (Tr. at 22-23)

**1.     Medical History, Treatment, and Conditions**

Ribolla's medical history is extensive, including evaluations by at least 18 different medical professionals as well as six surgeries. (D.I. 13 at 4-12) Relevant examinations are chronologically summarized below.

2

a.      **Physical Health Evaluations and Treatment**

Ribolla's relevant medical history begins in 2006 when he received a cervical discectomy

and fusion C6-7 by Dr. Ronald C. Sabbagh due to neck and back pain. (Tr. at 377) For the next

two years, Ribolla received follow-up treatment from Dr. Sabbagh, during which Dr. Sabbagh

noted that Ribolla was doing very well and could return to activities as tolerated, including going

back to work. (Tr. at 370-75)

On February 16, 2008, Ribolla received hip surgery by Orthopaedic Specialist Joseph J.

Mesa, M.D., to address fracture of the femoral neck on the right side of his hip due to a gunshot

wound. (Tr. at 66, 365) Dr. Mesa examined Ribolla in follow-up evaluations on a monthly basis

from March 2008 until July 2008, and noted that Ribolla had good range of motion in his knee

and ankle, gradually became fully weight bearing, and was ambulating with a cane, but had

issues with his hip's muscle weakness and tenderness. (Tr. at 334-38) Ribolla stopped seeing

Dr. Mesa after his July 2008 visit and did not return again until May 2009, at which time Dr.

Mesa noted that Ribolla still suffered persistent pain and tenderness in his hip, but that he had

good rotation and no weakness. (Tr. at 333) Dr. Mesa recommended Ribolla return in three

weeks, however Ribolla did not return until March 29, 2010, complaining of right knee pain after

suffering a fall. (Tr. at 332-33, 348) An MRI showed Ribolla had a nondisplaced femur fracture

with bone marrow edema. (Tr. at 348) A follow-up visit with Dr. Mesa in April 2010 showed

decreased tenderness and no significant pain. (Tr. at 332) Dr. Mesa recommended range of

motion and strengthening exercises, but opined that there was no need for surgical intervention.

(Tr. at 332, 654)

On January 21, 2010, Ribolla saw Renato Vesga, M.D., of Mid-Atlantic Spine and Pain

3

Physicians for treatment of chronic low back pain and pain in his neck, shoulders, and right leg. (Tr. at 687-89) Dr. Vesga interpreted an MRI of Ribolla's lumbar spine taken on June 16, 2009, finding that it showed mild degenerative disc changes and disc bulge at L4-L5. (Tr. at 689) Upon physical examination, however, Ribolla's gait was consistently noted as coordinated and smooth within normal limits with normal muscle strength in both upper and lower extremities, and normal muscle tone. (Tr. at 689) On April 15, 2010, upon examination of a shoulder MRI, Dr. Vesga found Ribolla was suffering from supraspinatus tendinitis and minor spurring of the acromial tip, and gave Ribolla a shoulder steroid injection for the pain. (Tr. at 669)

On August 4, 2010, Ribolla saw Registered Vascular Technologist Kirstin Palumbo, on the referral of Cardiologist Vincent Abbrescia, D.O., for a venous duplex ultrasound to evaluate clinical indications of hypertension and edema. (Tr. at 698-700) In interpreting the ultrasound, Dr. Abbrescia found no evidence of deep venous thrombosis in either lower extremity and mild-to-no reflux at the terminal valves of his saphenofemoral and saphenopopliteal junctions. (Tr. at 700)

On August 24, 2010, Ribolla was seen by his primary care physician, Lisa Reid, M.D., who noted the presence of plus two edema.[2] (Tr. at 425) By September 14, 2010, Dr. Reid found Ribolla's edema decreased to plus one. (Tr. at 423) On October 20, 2010, Ribolla went to the emergency room at the Bayhealth Medical Center complaining of a fever. (Tr. at 510, 518) Upon physical examination, the doctor noted Ribolla appeared alert and oriented and was showing signs of one-plus pitting lower extremity edema. (Tr. at 514) The next day, Ribolla was

[2]The "plus" classification of edema is a measure of interstitial fluid pressure on a scale of one to four, with "one-plus" or "plus one" meaning "edema that is barely detectable." A. Guyton, *Textbook of Medical Physiology* 376 (6th ed. 1981).

4

admitted to the Milford Memorial Hospital due to pneumonia, and stayed overnight until October 23, 2010. (Tr. at 506) Ribolla returned to his primary care physician, Dr. Reid, on October 26, 2010. (Tr. at 421) Dr. Reid noted Ribolla's recent hospital visit, and recorded that he was doing well and had no edema at that time. (Tr. at 421)

Ribolla went back to the emergency room on December 19, 2010, complaining of joint pain. (Tr. at 482) Physical examination showed his extremities were normal with adequate strength and full range of motion, but with signs of two plus and one plus edema. (Tr. at 484) Ribolla's primary diagnosis at this time was localized peripheral edema and he was directed to elevate his legs, use special support stockings, restrict salt in his diet, and avoid long periods of standing. (Tr. at 484, 486)

One month later, on January 17, 2011, Ribolla had a follow-up appointment with Dr. Abbrescia, at which Dr. Abbrescia noted that Ribolla was suffering from hyperlipidemia, controlled hypertension, stable acute renal failure/chronic kidney disease, elevated liver function testing, and dependent peripheral edema with no evidence of reflux disease. (Tr. at 438, 441-42) Dr. Abbrescia also noted that Ribolla was drinking two to three gallons of heavily sweetened iced tea on a daily basis for about a year, that there was an excessive amount of salt in his diet, and that he had longstanding tobacco abuse. (Tr. at 438-39)

On March 1 and April 20, 2011, Ribolla was examined by Glen Rowe, D.O., at the Bayhealth Medical Center for neck and shoulder pain. (Tr. at 737, 739) Dr. Rowe's assessment included Bankart lesion in the left shoulder, multiple facet arthropathy status post fusion C5-C6 with incomplete bone fusion representing pseudoarthritis, left shoulder AC joint degenerative disease, and right shoulder tendonitis. (Tr. at 737)

5

From March 21, 2011 to January 25, 2012, Ribolla was examined by Steven Manifold, M.D., for left shoulder pain. (Tr. at 831-32, 856-74) On October 13, 2011, after Ribolla failed nonoperative treatment, Dr. Manifold performed a left shoulder arthroscopic subacromial decompression and biceps tenotomy. (Tr. at 871-72) Ribolla attended post-operative follow-up examinations with Dr. Manifold from October 19, 2011 through January 25, 2012, where Dr. Manifold directed Ribolla to use bracing, a cane, and splint immobilization. (Tr. at 856, 859, 862, 865)

Ribolla had follow-up visits with his cardiologist, Dr. Abbrescia, on February 2, April 12, and August 15, 2012. (Tr. at 1141, 1151, 1157) At each of these appointments, Dr. Abbrescia reported Ribolla's hyperlipidemia, diet, dependent edema with no evidence of venous reflux disease, and negative workup for nephrotic syndrome, obstructive sleep apnea, controlled hypertension, stable bipolar disorder with anger management issues, stable acute renal failure/chronic kidney disease, continued tobacco abuse, and elevated liver enzymes. (Tr. at 1141, 1151, 1157) However, Dr. Abbrescia also noted Ribolla had a normal gait in these instances, and encouraged him to follow a healthy diet and "stay as active as possible." (Tr. at 1139, 1141, 1151-52) Further, between those visits, on May 22, 2012, Ribolla saw a Certified Physician Assistant, Kate Olson, at his primary care physician's office, who noted Ribolla's peripheral edema and that he was able to walk with a cane. (Tr. at 1193-96) PA Olson directed Ribolla to follow a no-salt diet, elevate his legs, and get support stockings. (Tr. at 1196)

Through February 2013, Ribolla saw Dr. Jie Zhu and Dr. Obi Onyewu for his chronic neck, shoulder, back, and hip pain. (Tr. at 921-1057) For this pain, Ribolla underwent a Spinal Cord Stimulation/Peripheral Nerve Stimulation implant on February 15, 2013. (Tr. at 921)

6

On March 11, 2013, Dr. Mesa referred Ribolla to Dr. James Rubano due to avascular necrosis of Ribolla's left hip and severe pain. (Tr. at 1189) Ribolla requested total left hip replacement, but due to lower extremity deep vein thrombosis in the left posterior tibial vein, Dr. Rubano would not clear him for the surgery. (Tr. at 1188-89, 1191) New evidence shows that, once medically cleared, Dr. Rubano performed the left hip replacement on November 7, 2013. (Tr. at 15-16)

### b. Mental Health Evaluations and Treatment

On December 28, 2006, Ribolla met with Frederick Kurz, Ph.D., for a neuropsychological evaluation for Vocational Rehabilitation. (Tr. 327-30) Dr. Kurtz concluded that Ribolla functioned within average to borderline levels of intelligence, had limited physical stamina due to chronic back and leg pain, experienced moderate levels of depression, and had limited academic, verbal, and attention skills – ultimately recommending that Ribolla's long-term vocational outcome was guarded to poor. (Tr. at 330-31) Dr. Kurz's diagnostic impressions included mood disorder NOS (not otherwise specified), cognitive disorder NOS, attention deficit disorder, reading and mathematics disorders, hypertension, ulcer, and chronic pain disorder, and a global assessment functioning ("GAF") score of 60, indicating mild to moderate symptoms. (Tr. 330-31)

Beginning on January 22, 2010, Ribolla was treated by nurse-practitioner Caren Coffy-McCormick. (Tr. at 452) On his initial visit, Ribolla was evaluated as having attention deficit hyperactivity disorder and a GAF score of 55, indicating moderate symptoms. (Tr. at 455) Throughout 2010, Ribolla was evaluated as having bipolar disorder as well as trouble sleeping, depression, mood swings, and anger outbursts due to his chronic pain. (Tr. at 449-51) By June

7

2, 2011, Nurse Coffy-McCormick's examination showed Ribolla was cooperative and oriented, but had decreased eye contact, reclusiveness, irritability, auditory hallucination but none recently, poor sleep, drowsiness, inadequate concentration, and inhibited recent memory. (Tr. at 804-06) She diagnosed Ribolla as having bipolar II disorder and attention deficit hyperactivity disorder with a GAF score of 50, indicating serious symptoms. (Tr. at 807)

On March 7, 2011, Ribolla met with licensed psychologist Brian Simon, Psy. D., to determine his level of functional problems for disability determination purposes. (Tr. at 701) Dr. Simon observed that Ribolla was able to remain seated for an extended period during the evaluation without any complaint and that his gait and posture seemed fine, noting that Ribolla did not have any obvious problems ambulating. (Tr. at 704) Dr. Simon concluded that Ribolla suffered from bipolar II disorder and possibly also antisocial personality disorder, problems learning, significant problems getting along with others, and difficulty being able to be employed for extended periods. (Tr. at 705) While Dr. Simon found Ribolla had minor difficulties maintaining concentration, focus, and attention, he ultimately found Ribolla capable of performing simple tasks and avoiding hazards at work. (Tr. at 706) Dr. Simon assessed Ribolla's GAF score was 47, indicating serious symptoms.

From October 2011 through 2013, Ribolla continued seeing Nurse Coffy-McCormick at McCormick & Associates. (Tr. at 1127) On March 3, 2013, she reported that Ribolla had poor to no ability to: remember work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention for two-hour segments; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and

8

workweek without interruptions from psychologically-based symptoms; perform at a consistent

pace without an unreasonable number of rest periods; ask simple questions; get along with co-

workers or peers; deal with normal work stress; or interact with the general public. (Tr. at 1129-

30) Ultimately, however, Nurse Coffy-McCormick diagnosed Ribolla with bipolar disorder and

personality disorder NOS with a GAF score of 65, indicating only mild symptoms. (Tr. at 1127)

Ribolla met with Nurse Coffy-McCormick again on April 3, 2013, at which time she

noted that Ribolla had minimal response to treatment, was still angry all the time, had difficulty

concentrating, and continued to suffer with depression, sleep difficulty, and irritability. (Tr. at

1058-59) She also noted that Ribolla's short and long term memory were intact, there were no

apparent signs of hallucinations or other indicators of psychotic process, and his cognitive

functioning and fund of knowledge were intact and age appropriate. (Tr. at 1059)

### 2.    Medical Source Opinions

#### a.    Examining Consultants

Ribolla was referred to Muhammed Niaz, M.D., for a consultative physical examination

on March 26, 2011. (Tr. at 724) Dr. Niaz noted poor hygiene, little eye contact, and limited

neck movements, but found that Ribolla was able to ambulate and walk without support,

although he appeared to be under the influence of medication and was unable to walk in a

straight line. (Tr. at 724-25) Dr. Niaz's ultimate assessment was that Ribolla would have

difficulty doing any job due to his multiple physical and psychiatric issues. (Tr. at 726)

Two years later, Ribolla was referred to Joseph Straight, M.D., for a consultative

examination on May 13, 2013. (Tr. at 29, 1245) Dr. Straight noted that Ribolla was able to sit

comfortably on the exam table and used a cane for ambulating throughout the office, but was

9

able to move his mother's two full bags without his cane. (Tr. at 1246) Dr. Straight's final impression included chronic neck and low back pain, chronic shoulder pain bilaterally, avascular necrosis of the left femoral head, and bipolar disorder. (Tr. at 1247) Dr. Straight concluded that Ribolla was not limited in the amount of hours he works in an 8-hour day nor in his ability to sit when given normal breaks, but recommended that Ribolla should not sit for more than one to two hours at a time without the ability to stand and stretch. (Tr. at 1248) Dr. Straight also found that Ribolla was limited in his ability to stand and walk to no more than 4 hours in an 8-hour day, and no more than 20 to 30 minutes at a time, and also in his ability to reach above chest and shoulder height. (Tr. at 1248) Dr. Straight noted that Ribolla may intermittently need an assistive device for prolonged or long ambulation, but that one was not required for all ambulation. (Tr. at 1248) Last, Dr. Straight found that Ribolla was not limited in the fine motor skills of his hands, but that he may be limited to no more than occasional bending or twisting at the trunk. (Tr. at 1248)

### b.    Non-examining Consultant

Michael Borek, D.O., reviewed Ribolla's file on April 7, 2011, concluding that Ribolla could: occasionally lift twenty pounds; frequently lift ten pounds; stand and/or walk at least two hours in an eight hour workday; sit (with normal breaks) for a total of six hours in an eight hour workday; and perform most postural activities except climbing a ladder, rope, or scaffold. (Tr. at 730-32) Dr. Borek also concluded that Ribolla had no visual or communicative limitations and almost unlimited manipulative ability with the sole exception of being unable to reach in all directions. (Tr. at 732-33)

### 3.    The Administrative Hearing

The ALJ conducted two administrative hearings. (Tr. at 22) The first took place on April

10

24, 2013, at which both Ribolla and an impartial VE, Tony Melanson, testified. (Tr. at 54) The supplemental hearing took place on August 6, 2013, at which only impartial VE Christina L. Beatty-Cody testified.

### a. Ribolla's Testimony

Ribolla testified that he is 5' 8" and weighs approximately 204 pounds, and that he stopped working in 2008 after he was shot in his right hip. (Tr. at 60, 65) He testified that the gunshot wound also caused his back injury, which grew steadily worse as time went on, peaking in 2010, leading him to seek treatment. (Tr. at 67-68) Part of this treatment included the full-time electric stimulator implant he received to help the pain from his right hip, both legs, and lower back. (Tr. at 66) Despite this implant, Ribolla maintained that he still had constant pain in his lower back and right hip, at a level of seven or eight out of ten, and that he needed a cane for walking and supporting himself. (Tr. at 68-70) Ribolla also discussed his left hip pain and his need for a total hip replacement due to avascular necrosis.[3] (Tr. at 71) He then reported his sleep apnea and COPD, for both of which he uses a breathing machine, his habit of smoking half a pack of cigarettes per day, and his recent trouble lifting his arm over his head. (Tr. at 73-77) On questioning from his attorney, Ribolla stated that his edema requires him to elevate his legs as much as he can and that his colitis requires him to take frequent restroom breaks. (Tr. at 88)

Turning to his mental conditions, Ribolla testified that, as of the date of the hearing, he was still receiving mental treatment, reporting to Nurse Coffy-McCormick once a month, and taking medications. (Tr. at 76-77) Ribolla stated that he had a lot of trouble concentrating and staying focused on the tasks in front of him and consistently experienced racing thoughts, but that

---

[3]Since testifying, Ribolla has received the total hip replacement. (D.I. 13 at 7)

11

his mental problems had improved with medication. (Tr. at 80-81)

After being questioned on his work ability and daily activity, Ribolla testified that he did not think he could walk for an hour, the longest he could stand would be about 20 to 30 minutes, the longest he could sit was an hour, and the most he could lift was five pounds. (Tr. at 82) However, Ribolla had no problem using his hands and could shower, get dressed, use a microwave, vacuum, change the bed sheets, and make himself a sandwich, all without any trouble. (Tr. at 83-84) Ribolla also stated that he is able to drive for simple errands and ride a lawn mower without difficulty, that he enjoyed playing video games, and attended church every Sunday without any difficulty. (Tr. at 85-86)

### b. Vocational Experts' Testimony

VE Tony Melanson ("Melanson") testified that Ribolla's prior work experience all included light to medium, semi-skilled to unskilled work, and that Ribolla would be unable to return to it with his current residual functional capacity. (Tr. at 93-95) Melanson testified that a hypothetical person of Ribolla's age, education, work experience, and postural limitations would be able to perform some light and/or sedentary jobs. (Tr. at 95) For light jobs, Melanson recommended packer positions (roughly 200 of which are available within a 75-mile radius), light office helper positions (175 positions locally), and light, unskilled machine operator positions (150 positions locally). (Tr. at 95-96) For sedentary jobs, Melanson recommended packer positions again (150 sedentary positions locally), sorter or inspector positions (200 positions locally), and machine feeder positions (175 positions locally). (Tr. at 96-97) However, Melanson opined that due to Ribolla's use of a cane, the light positions would be eliminated and he would only be able to work at the sedentary positions. (Tr. at 97-98)

12

On cross-examination by Ribolla's attorney, Melanson testified that if the hypothetical person needed to elevate his legs (to 180 degrees or more), it could cause problems with the sedentary positions. (Tr. at 97) Furthermore, Melanson stated that if the hypothetical person was going to need to alternate sitting and standing every half hour and have a 20-minute break to deal with pain, it would likely be too much for competitive employment. (Tr. at 99-100)

At the supplemental hearing, VE Christina L. Beatty-Cody ("Cody") testified that the hypothetical individual could perform light level work, including the positions of inserter (860 positions locally), hand bander (1,700 positions locally), and order caller (1,150 positions locally). (Tr. at 49-50) At the sedentary level, Cody testified that the hypothetical person could work as a type copy examiner (1,400 positions locally), a surveillance system monitor (1,800 positions locally), or a document preparer (1,300 positions locally). (Tr. at 50)

On cross-examination, Cody testified that taking ten-minute breaks every half hour as well as leg elevation at the work station would be work-preclusive due to a reduction in productivity. (Tr. at 51) On re-direct from the ALJ, however, Cody clarified that it would be feasible, for all the jobs she listed, for the hypothetical person to need to shift positions (e.g., get up after two hours and sit down after 20-30 minutes of standing or walking). (Tr. at 52)

## C.     The ALJ's Findings

On August 8, 2013, the ALJ issued the following findings:

> 1.     The claimant has not engaged in substantial gainful activity since January 11, 2011, the application date (20 C.F.R. 416.971 *et seq.*)
>
> 2.     The claimant has the following severe impairments: right hip fracture status-post surgery; left shoulder arthroscopy; lumbar degenerative disc disease; obesity; and depression (20 C.F.R.

13

416.920(c))

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926)

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except can stand for 20-30 minutes and walk for 20-30 minutes at a time, for a combined total of 4 hours in an 8-hour workday, can sit for 2 hours at a time, for a total of 8 hours; allow for intermittent use of a cane to ambulate; occasional postural activities, but no climbing of a rope, ladder, or scaffold or crawling; should avoid reaching overhead with both arms; and avoid exposure to unprotected heights and operating a motor vehicle. He is limited to simple unskilled work, work not at a production pace, meaning working at an assembly line or paid by the piece, and work that is essentially isolated with only occasional supervision.

5.     The claimant is unable to perform any past relevant work (20 C.F.R. 416.965)

6.     The claimant was born on October 25, 1970 and was 40 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.F.R. 416.963)

7.     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 416.964)

8.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* S.S.R. 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2)

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 416.969 and 416.969(a))

10.     The claimant has not been under a disability, as defined in

the Social Security Act, since January 11, 2011, the date the
application was filed (20 C.F.R. 416.920(g))

(Tr. at 24-35)

## III.   LEGAL STANDARDS

### A.   Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine

issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

n. 10 (1986).  A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed

must support its assertion either by citing to "particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for the purposes of the motions only), admissions, interrogatory answers,

or other materials," or by "showing that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).  If the moving party has carried its burden,

the nonmovant must then "come forward with specific facts showing that there is a genuine issue

for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).  The Court will "draw

all reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than

15

simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## B.     Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

16

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190–91. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593–95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190–91.

17

## IV.   DISCUSSION

### A.   Disability Determination Process

Title XVI of the Social Security Act provides for the payment of disability benefits to

indigent persons under the SSI program.  42 U.S.C. § 1382(a).  A "disability" is defined for

purposes of SSI as the inability to do any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42

U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is disabled "only if his physical or mental

impairment or impairments are of such severity that he is not only unable to do his previous work

but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); *see also Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a

five-step sequential analysis.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel,* 186 F.3d

422, 427–28 (3d Cir. 1999).  If a finding of disability or nondisability can be made at any point in

the sequential process, the Commissioner will not review the claim further.  *See* 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any

substantial gainful activity.  *See* 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I) (mandating

finding of nondisability when claimant is engaged in substantial gainful activity).  If the claimant

is not engaged in substantial gainful activity, step two requires the Commissioner to determine

whether the claimant is suffering from a severe impairment or a combination of impairments that

18

is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) (mandating finding of nondisability when claimant's impairments are not severe), 416.920(a)(4)(ii). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer,* 186 F.3d at 428. When a claimant"s impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant"s impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating that claimant is not disabled if claimant is able to return to past relevant work); *Plummer,* 186 F.3d at 428. A claimant's RFC is "that which [the] individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter,* 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer,* 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant"s impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of nondisability when claimant can adjust to other work); *Plummer,* 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer,* 186 F.3d at 428. In other

words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant"s impairments. *See id.* At this step, the ALJ often seeks the assistance of a VE. *See id.*

### B.    Issues Raised on Appeal

On appeal, Ribolla raises four arguments in support of remand: (1) the ALJ improperly classified his edema as non-severe; (2) the ALJ improperly weighed the opinions of treating psychiatric nurse, Nurse Coffy-McCormick, and examining consultants, Dr. Niaz and Dr. Straight; (3) the Commissioner failed to meet her burden to identify jobs consistent with Ribolla's RFC; and (4) new evidence of the duration of Ribolla's avascular necrosis requires consideration on remand. (D.I. 13 at 1-2)

#### 1.    Severity of Ribolla's Edema

Ribolla contends that the ALJ committed legal error in classifying his edema as "non-severe." (D.I. 13 at 18)  The Commissioner responds that the ALJ appropriately considered Ribolla's edema and substantial evidence supported the finding that it was not a severe impairment. (D.I. 17 at 3)  The Court agrees with the Commissioner.

Ribolla argues that while the ALJ mentioned his hospital visit in 2010 due to complaints of edema, the ALJ failed to mention that physical examination during that hospitalization "showed two plus and one plus edema and a recommendation that elevating his legs may be helpful." (D.I. 13 at 18)  Further, Ribolla contends that the ALJ failed to mention other findings of edema as a whole. (D.I. 13 at 18-19)  However, as recognized by the Third Circuit,

"consideration of all the evidence does not mean that the ALJ must explicitly refer to each and every exhibit in the record." *Mays v. Barnhart*, 227 F. Supp. 2d 443, 448 (E.D. Pa. 2002), *aff'd* 2003 WL 22430186 (3d Cir. Oct. 27, 2003). While the ALJ did not specifically discuss the entirety of each medical record, that does not mean that the ALJ failed to appropriately consider all of the evidence in the record as a whole. *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004); *Mays*, 227 F. Supp. 2d at 449.

Here, the ALJ considered Ribolla's hospitalization for intermittent edema of the legs and diagnosis of peripheral edema and contrasted it with cardiology records indicating only mild edema. (Tr. at 25) Medical records showed that Ribolla's edema was in a constant state of flux. At some points it was as high as two plus, and other times it was completely nonexistent. (Tr. at 421-25) In 2012, records from Ribolla's cardiologist repeatedly show "dependent edema with no evidence of venous reflux disease and negative workup for nephrotic syndrome," along with a "normal gait." (Tr. at 1139, 1141, 1151, 1157) This is consistent with records from his primary care physician, classifying Ribolla's peripheral edema as "moderate" in severity, and noting that it had been exacerbated by "noncompliance with diet and sedentary lifestyle." (Tr. at 1193) In 2012 and 2013, Dr. Onyewu and Dr. Zhu reported Ribolla's gait was coordinated and within normal limits, his muscle strength and tone in both the upper and lower extremities were within normal limits, and his range of motion was grossly normal. (Tr. at 940, 945, 949, 955, 958, 961, 964, 970, 973, 976, 979-80, 986, 989, 996-97) Therefore, substantial evidence exists to support the ALJ's finding that Ribolla's edema was only a mild, not severe, impairment.

Ribolla also contends that even if his edema is non-severe, the ALJ erred in failing to include the need for leg elevation in the RFC assessment, which must include limitations from all

21

impairments, even those which are not severe. (D.I. 13 at 21, 24 (citing 20 C.F.R. §

416.945(a)(2))  As the Third Circuit has recognized, "[l]imitations that are medically supported

and otherwise uncontroverted in the record, but that are not included in the hypothetical question

posed to the expert, preclude reliance on the expert's response." *Rutherford v. Barnhart*, 399

F.3d 546, 554 (3d Cir. 2005) (internal citations omitted).  However, "[l]imitations that are

medically supported but are also contradicted by other evidence in the record may or may not be

found credible – the ALJ can choose to credit portions of the existing evidence, but cannot reject

evidence for no reason or for the wrong reason." *Id.* (internal quotations omitted).  Finally,

"limitations that are asserted by the claimant but that lack objective medical support may

possibly be considered nonetheless credible.  In that respect the ALJ can reject such a limitation

if there is conflicting evidence in the record, but should not reject a claimed symptom that is

related to an impairment and is consistent with the medical record simply because there is no

objective medical evidence to support it." *Id.*

In the present case, Ribolla's leg elevation is medically-supported, but also contradicted

by other evidence in the record.  Multiple records suggest leg elevation as a way for Ribolla to

relieve his edema. (*See* Tr. at 484-86, 1141, 1151-52, 1158, 1196)  However, the medical

records also show that Ribolla was instructed to "stay as active as possible," employ a low/no salt

diet, and use support stockings. (Tr. at 1141, 1152, 1158)  Ribolla himself testified that he is

able to clean his home, vacuum, make the bed, do laundry if needed, go shopping with his

mother, and drive for simple errands – all without needing to elevate his legs. (Tr. at 26, 83-86)

Therefore, the Court finds that substantial evidence supports the ALJ's determination to discount

this limitation in the hypothetical to the VEs.[4]

## 2. Weight of Medical Opinions

Next, Ribolla argues that the ALJ improperly weighed the opinions of his treating

psychiatric nurse, Nurse Coffy-McCormick, as well as examining consultants, Dr. Niaz and Dr.

Straight. (D.I. 13 at 24, 29-30) In reviewing the ALJ's analysis, it is not for the Court to

re-weigh the medical opinions in the record. *See Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 659

(D. Del. 2008). Rather, the Court must determine whether substantial evidence exists to support

the ALJ's weighing of those opinions. *See id.*

### a. Nurse Practitioner Caren Coffy-McCormick

As a nurse-practitioner, Nurse Coffy-McCormick is not an "acceptable medical source"

that can "establish . . . a medically determinable impairment." 20 C.F.R. §§ 404.1513(a).

However, evidence from nurse practitioners may be used to show "the severity of [an]

impairment[ ] and how it affects [a claimant's] ability to work." 20 C.F.R. § 404.1513(d). In

evaluating such evidence, factors to be considered include how long the practitioner has known

the claimant and how frequently the practitioner has seen the claimant; how consistent the

opinion is with other evidence; the degree to which the claimant presents relevant evidence to

support an opinion; how well the source explains the opinion; whether the source has a specialty

---

[4]Ribolla also contends that the ALJ erred in finding leg elevation not a functional
limitation on the grounds that Ribolla has difficulty maintaining a healthy diet. (D.I. 13 at 20)
Ribolla cites S.S.R. 82-59 in arguing that "[i]n order to deny benefits for failure to follow
treatment recommendations there must . . . first be a finding of disability followed by a showing
that treatment was prescribed which will restore ability to work, along with evidence that
treatment was refused by the claimant without justifiable cause." (D.I. 13 at 20-21) Ribolla
provides no citation to the record for his argument that the ALJ denied benefits based on
Ribolla's failure to follow a healthy diet.

23

related to the individual's impairments; and any other factors that support or refute the opinion. *See* 20 C.F.R. § 404.1527(c); *Roache v. Colvin*, 170 F. Supp. 3d 655, 672 (D. Del. 2016).

Ribolla contends that the ALJ improperly discounted Nurse Coffy-McCormick's medical findings of bipolar disorder; failed to mention multiple mental status exams; and erroneously stated that Ribolla did not begin seeing Nurse Coffy-McCormick until 2011. (D.I. 13 at 21-22) As stated above, "consideration of all the evidence does not mean that the ALJ must explicitly refer to each and every exhibit in the record." *Mays*, 227 F. Supp. 2d at 448. Thus, the ALJ's failure to mention each mental status exam is not dispositive. Furthermore, while the ALJ did state that Ribolla only began seeing Nurse Coffy-McCormick in 2011, although records show treatment actually began in 2010, the ALJ did mention Ribolla's treatment at the Mind Body Consortium in 2010. (Tr. at 30) The fact that the ALJ did not associate the Mind Body Consortium visits with Nurse Coffy-McCormick does not appear to have affected the ALJ's analysis of Ribolla's mental impairment as a whole.

In evaluating Ribolla's mental condition, the ALJ weighed evidence from four different evaluators, including Nurse Coffy-McCormick, and expressly mentioned Ribolla's bipolar disorder. (Tr. at 30-31) The ALJ considered findings that Ribolla was able to follow directions and answer questions in complete, goal-directed sentences and had intact attention, concentration, and memory, and contrasted them with findings that Ribolla had problems getting along with others, had fair to poor attention and concentration, and had problems with social functioning. (Tr. at 30) The ALJ also considered the various GAF scores Ribolla received from 2006 until the time he applied for SSI in 2011, finding that his typical range among the four evaluators was between 55-65, representing mild to moderate symptoms. (Tr. at 30, 33) Lastly,

24

the ALJ considered Ribolla's own statements that his mental symptoms had been under control with medication and that he was able to shop for groceries, attend church every Sunday, play video games, and do all of his normal activities of daily living. (Tr. at 31, 77, 81, 1245)

In weighing the various evaluators' opinions, the ALJ concluded that Nurse Coffy-McCormick's opinion was accepted, but entitled to little weight because it was not supported by the mental health record provided. (Tr. at 33) The ALJ found that Nurse Coffy-McCormick's evaluation that Ribolla had poor to no ability to do even unskilled work, marked restriction of activities of daily living, extreme difficulties in maintaining social functioning, and frequent deficiencies of concentration, were not only inconsistent with the mental health record as a whole, but also with Nurse Coffy-McCormick's own findings that Ribolla's GAF score was 65, indicating only mild symptoms. (Tr. at 33) Thus, while Nurse Coffy-McCormick began treating Ribolla in 2010 and continued treating him through April 2013, the ALJ found her opinion inconsistent with other evidence in the record – namely, inconsistent with other evaluators' opinions, Ribolla's own evidence, and Nurse Coffy-McCormick's own GAF score. (Tr. at 33)

Therefore, the Court finds that substantial evidence exists to support the ALJ's determination to give little weight to the opinions of Nurse Coffy-McCormick.

### b.    Examining Consultants, Dr. Niaz and Dr. Straight

The ALJ found Dr. Straight's opinion was entitled to great weight because it was supported by the accompanying consultative examination report and treatment record. (Tr. at 32) The ALJ further determined that Dr. Niaz's opinion was entitled to little weight because it was

unsupported by the record as of March 2011.[5]  (Tr. at 33)

Social Security regulations provide that "the opinions of State agency medical . . . consultants and other program physicians . . . can be given weight only insofar as they are supported by evidence in the case record" including, "the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical . . . consultant or other program physician." S.S.R. 96–6p, 1996 WL 374180, at *2 (July 2, 1996).

Ribolla argues that the ALJ "improperly found Dr. Niaz's exam showed no observable signs of impairment . . . when in fact Dr. Niaz's exam showed limited range of motion." (D.I. 18 at 1)  The ALJ, however, did not find that Dr. Niaz's exam showed no signs of impairment – instead, the ALJ found Dr. Niaz's opinion on Ribolla's impairment was entitled to less weight because it was inconsistent with the rest of the medical record. (Tr. at 33)  Ribolla also argues that the ALJ discounted the need for any type of assistive device, but included intermittent use of a cane in the RFC, thus "indicating that [the ALJ] agrees with Dr. Niaz that Mr. Ribolla needs to use a cane." (D.I. 13 at 29)  The ALJ however did not reject the notion – suggested by Dr. Niaz or otherwise – that Ribolla may occasionally use a cane. She did find, however, that use of a cane was not required. (Tr. at 28)  Once again, the ALJ gave Dr. Niaz's opinion less weight because it was inconsistent with the remaining medical evidence regarding Ribolla's gait, range of motion, and ability to ambulate. (Tr. at 33, 689, 704, 753-54, 756, 760, 1139, 1151)

---

[5] The ALJ's opinion states that Dr. Niaz's opinion is entitled to little weight because "it is supported by the record as of March 2011." Leading up to her conclusion, the ALJ also states that Dr. Niaz's opinion is specifically contradicted by surrounding evaluations in the medical record.

26

In weighing Dr. Straight's opinion, the ALJ found it important that Dr. Straight had the opportunity to examine Ribolla and review the most updated treatment record. (Tr. at 32) While Dr. Niaz examined Ribolla in March 2011, Dr. Straight's examination took place in May 2013. (Tr. at 29, 31, 724, 1245) Dr. Straight, thus, had the ability to evaluate Ribolla in light of his recently-diagnosed avascular necrosis. Despite this recent diagnosis, the ALJ discussed Dr. Straight's findings that Ribolla was still able to move his mother's bags without use of his cane, and exhibited full range of motion of his left hip. (Tr. at 32) Contrary to Ribolla's assertions, (D.I. 13 at 30), Dr. Straight also considered the combination of Ribolla's physical and mental impairments, including his bipolar disorder. (Tr. at 1245) On the whole, the ALJ found Dr. Straight's opinion was supported by the accompanying consultative examination report and treatment record, and therefore afforded his opinion greater weight. (Tr. at 32) Substantial evidence supports this conclusion.

### 3.    Establishing the Availability of Other Work in the National Economy

Ribolla argues that the Commissioner failed to meet her burden of identifying jobs Ribolla could perform with use of a cane. (D.I. 13 at 32) The Commissioner responds that the ALJ appropriately determined both light and sedentary jobs Ribolla could perform. (D.I. 17 at 8) The Court again agrees with the Commissioner.

The ALJ determined that Ribolla had the ability to perform light unskilled work in accordance with his RFC. (Tr. at 34) While the ALJ found Ribolla could not perform his previous jobs, both VEs testified that a hypothetical individual with Ribolla's age, education, work background, and physical limitations could do other jobs in the national economy. (Tr. at 49-50, 95-98) The VEs' testimony in response to the ALJ's hypothetical is substantial evidence

27

upon which the ALJ may rely. *See Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002).

In contrast, the ALJ was not required to accept the VEs' testimony that Ribolla's subjective complaints (e.g., using a cane and elevating his legs), if fully credible, would preclude employment because the ALJ reasonably found that those additional limitations were not supported by the evidence. *See Harris v. Astrue*, 886 F. Supp. 416, 426 (D. Del. 2012); *see also Rutherford*, 399 F.3d at 554.

Additionally, while medical evidence supports Ribolla's use of a cane, the evidence also shows that Ribolla was not required to use one, and further, whether he was using one or not, he was still able to attend social activities or run errands. (Tr. at 32, 69-70, 83-86) Therefore, the fact that Ribolla may need a cane does not erode his ability to perform the jobs identified by the VEs. Substantial evidence supports the ALJ's decision.

### 4.     Remand

Lastly, Ribolla argues remand is warranted because new evidence exists that would have made a difference in the ALJ's assessment – namely, total left hip replacement due to avascular necrosis. (D.I. 13 at 35) The Commissioner counters that the new evidence at issue arose after the ALJ rendered her decision and, therefore, does not meet the Third Circuit's standard for "new evidence" that should be considered. (D.I. 17 at 9-10) The Court agrees with the Commissioner.

To support a "new evidence" remand, the evidence must be both "new"and "material." *Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). As stated by the Third Circuit, "[a]n implicit materiality requirement [requires] that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Id.* at

28

833.

Here, Ribolla contends that his initial evidence of avascular necrosis was not considered a severe impairment because it did not meet the duration requirement. (D.I. 13 at 34) He now asserts that, due to his surgery on November 7, 2013, and his initial hip pain on November 30, 2012, this new evidence indicates that the impairment lasted at least 12 months. (D.I. 13 at 35)

The newly-alleged time period remains under 12 months. Further, this new evidence relates solely to the subsequent deterioration of the previously non-disabling condition Ribolla already presented to the ALJ. Therefore, the Court denies Ribolla's request for remand.

## V.    CONCLUSION

Given the substantial evidence supporting the ALJ's findings, the Court concludes that neither an award of SSI nor a remand is warranted. Accordingly, the Court will grant Defendant's motion for summary judgment and deny Plaintiff's motion for summary judgment. An appropriate Order follows.

29